[No. B130553. Second Dist., Div. Five. Mar. 27, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL HERRERA RAMIREZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of: the heading for part II.A.; part II.B. in its entirety including the heading; and parts III.C. through G.

■■■■■■■■■■■■■

**COUNSEL**

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Steven D. Matthews and Jennevee H. De Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

### I.  INTRODUCTION

Defendant, Daniel Herrera Ramirez, appeals from his convictions for operating a chop shop (Veh. Code, § 10801), grand theft of an automobile (Pen. Code,[1] § 487, subd. (d)), second degree burglary (§ 459), possession of a firearm by a felon (§ 12021, subd. (a)(1)), and perjury (§ 118). In the published portion of the opinion, we discuss the sufficiency of the evidence to support defendant's conviction of operating a chop shop, a violation of Vehicle Code section 10801. In the published portion of the opinion, we conclude there was substantial evidence he operated a chop shop within the meaning of Vehicle Code section 10801. As is discussed in the unpublished portion of our opinion, we remand for a hearing on whether defendant is entitled to any presentence credits. Otherwise, the judgment is affirmed.

### II.  FACTUAL BACKGROUND

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

■■■ We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.
*See footnote, *ante*, page 408.

L.Ed.2d 560]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908-909; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].) On January 15, 1998, Detective Santo Porto executed a search warrant at 342 Columbia Avenue in Los Angeles. He was searching for items associated with stolen automobile and trucks. Detective Porto found: defendant's California identification card; a list of vehicle license plates and vehicle identification numbers (VIN); mail addressed to defendant at that address; and a phone book bearing defendant's name. Detective Porto's subsequent check of the VIN's and license plates revealed that 14 of the listed automobiles were exported and four were registered in California.

Shortly after the search warrant was served, defendant was followed by police officers to 143 East 87th Place in Los Angeles. Thereafter, defendant was seen at 143 East 87th Place in Los Angeles on two additional occasions. On March 5, 1998, Detective Porto set up a surveillance at that address. Defendant was seen as a passenger in a red Toyota truck driven by Luis Alberto Santos near the 87th Place address. The red truck had previously been observed leaving the 87th Place address. Detective Porto followed the truck to Azteca Auto registration service in Long Beach. Such registration businesses legitimately provide automobile registration services. However, Detective Porto was aware that some of these registration businesses also provide a different set of license plates (subplates) and duplicate titles or registrations. Auto thieves use these services because they do not have to present identification to complete the transactions. After defendant and Mr. Santos left the Azteca registration service, Detective Porto spoke to an employee there named Alfonso Reyes. Detective Porto spoke to Mr. Reyes about defendant's transactions. Mr. Reyes gave Detective Porto documentation regarding a VIN for a Honda Accord automobile and two California license plate numbers.

After they left the Azteca business, defendant and Mr. Santos were followed to a residence in Long Beach, the occupant of which had previously been arrested for selling three stolen automobiles. Thereafter, they were followed to a residence on 109th Place. Defendant got out of the truck and spoke with four Hispanic men standing in front of the residence. Defendant and Mr. Santos then returned to the 87th Place residence. At approximately 7:00 p.m., they drove to Vermont and Franklin in Los Angeles, where they were observed driving around the neighborhood for 15 minutes before returning to 87th Place. They appeared to be "casing" the neighborhood. Detective Porto returned to the 109th Place address. A Department of Motor Vehicles check on the two cars in the driveway at the 109th Place address revealed that a Honda Civic had a license plate issued to a green Honda Accord. The Honda Accord, in the driveway, had two additional plates assigned to it.

The following evening defendant and a woman left the 87th Place residence in a green Toyota Forerunner truck. Detective Porto followed them to Pico and Burlington Streets in Los Angeles. Three men got into the Forerunner. Detective Porto then followed the truck to Torrance, where the truck drove around the neighborhood at a speed of five to 10 miles per hour for 90 minutes before returning to Vermont and New Hampshire Streets. Once the truck parked, two men got out and walked to a locked 1986 blue Toyota pickup truck. One of the men had a physical build which was similar to that of defendant. The driver's door was unlocked and the truck was driven away. The Forerunner truck traveled with the blue Toyota truck back to 143 East 87th Place address. The Forerunner was parked on the street. The blue Toyota was driven into the rear yard of the 87th Place residence. Thereafter, defendant and another man entered the Forerunner. The female was still in the Forerunner. The Forerunner was driven slowly through a residential neighborhood, stopping on Regent Street. Defendant and another man walked to the passenger side of a 1998 Chevrolet Suburban. Shortly thereafter, the detectives saw the Forerunner truck leave the area. The officers followed the truck to a 7-Eleven store. Defendant got out of the truck. Defendant made a short telephone call before the Forerunner truck returned to Regent Street. Defendant ran to the driver's side of the Suburban. Defendant opened the driver's side door and knelt on the ground. Defendant looked inside the edge of the driver's side door, where the VIN sticker is typically located. Defendant ran back to the Forerunner truck and drove away. The Forerunner automobile returned to 143 East 87th Place. The Suburban truck had been leased to Kenny Zimmelman by Enterprise car rental. At the time it was leased, the truck was in good working condition. The locks were working. At the time it was towed back to the car rental company, the lock on the passenger door had been damaged or "punched" and the steering column was broken.

Detective Porto executed a search warrant at the 87th Place address the following morning, March 7, 1998. Defendant was asleep in a bedroom. A loaded handgun was located under the mattress of the bed on which he was sleeping. Detective Porto also recovered Department of Motor Vehicles (DMV) documents and drivers' licenses issued to Rene Reyes and Rene Huertarco Herrera Reyes. Each contained defendant's photograph. The DMV forms included release of liability forms for a 1988 Toyota truck and a 1994 Suzuki. The envelope also contained a certificate of title for a 1987 Toyota truck. In Mr. Santos's bedroom, a car stereo containing a certificate of title for a 1987 Toyota truck was located. The license plate for that truck was affixed to the blue Toyota stolen the previous evening from New Hampshire Street. The officers also recovered a punch tool, a Toyota ignition with a key, a drill, a metal cylinder, and dye stamps used to modify

a VIN that were on the kitchen table. Neither defendant nor Mr. Santos acknowledged ownership of a set of keys found on the table.

One of the keys opened a backyard shed, where Detective Porto found a black bag containing the tools required to alter a VIN including: an etching tool; silicone etchings or molds; a cordless etching tool; a circular grinder; a palm sander, a drill and drill bit; black primer paint; gloss black enamel paint; carburetor cleaner; a rivet gun; a flat-head screwdriver; a hammer; a ruler; silicone casings; sanding discs; rivets; silicone windshield glass and seal; a tube of silicon sealant; a slam hammer or dent poker; and other miscellaneous tools. Based on his experience, the surveillance conducted, and the items recovered, Detective Porto believed that defendant operated a chop shop.

Fingerprints subsequently lifted from the passenger side of the Suburban truck on Regent Street matched those of defendant. The cylinder on the passenger door lock of the Suburban had been damaged. When Ann Kozowski, owner of the blue Toyota pickup truck stolen from New Hampshire Street, went to pick up her truck, the ignition, locking club, license plates, and registration slip were missing. The license plates had been replaced. Additional stolen cars were recovered during a subsequent search of 147 East 109th Place.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

## III.   Discussion

### A.   *Relevant Law*

Defendant argues that there was insufficient evidence to support his conviction for operating a chop shop in violation of Vehicle Code section 10801, which states: "Any person who knowingly and intentionally owns or operates a chop shop is guilty of a public offense and, upon conviction, shall be punished by imprisonment in the state prison for two, three, or four years, or by a fine of not more than fifty thousand dollars ($50,000), or by both the fine and imprisonment, or by up to one year in the county jail, or by a fine of not more than one thousand dollars ($1,000), or by both the fine and imprisonment." Defendant argues that in order to be a chop shop operator, he had to have "a certain level of control over the enterprise" and had to be more than a "mere participant" in its operation.   (1b)   Our sole function in determining the sufficiency of the evidence is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a

*See footnote, *ante*, page 408.

reasonable doubt. (*Jackson v. Virginia, supra*, 443 U.S. at p. 319 [99 S.Ct. at p. 2789]; *People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698]; *People v. Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996].) The Courts of Appeal have also held: " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [30 Cal.Rptr.2d 525], quoting *People v. Mitchell* (1986) 183 Cal.App.3d 325, 329 [228 Cal.Rptr. 286].)

### B. *Chop Shop Operation*

██ Defendant argues the evidence was insufficient to prove that he owned or operated a chop shop. Defendant further argues that to be an owner or operator, he "necessarily must have had a certain level of control over the enterprise and have been more than a mere participant."

██ The California Supreme Court has determined: " '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197], quoting *People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) In the absence of a request, a trial court need not instruct on the meaning of the terms of the statute when that meaning is commonly understood and the terms are not used in a technical sense. (*People v. Estrada, supra*, 11 Cal.4th at p. 574; *People v. Rowland* (1992) 4 Cal.4th 238, 270-271 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]; See also *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514] [in determining legislative intent, appellate courts look to the words of the statute and give them their usual and ordinary meaning].)

██ The parties concede that the definitions of the terms "own" or "operate" as they apply to this statute have not yet been interpreted by the courts. However, we may look to the interpretation of those terms as they

have been applied in other contexts. In *People v. Sanchez* (1998) 62 Cal.App.4th 460, 471 [72 Cal.Rptr.2d 782], our colleagues in Division Two of this appellate district defined the word "operate" as follows: "The word 'operates' here [(§ 327, endless chain scheme)] has its ordinary meaning. Webster's Third New International Dictionary (1993) page 1581 defines 'operate' as 'to cause to function usu[ally] by direct personal effort: work (~ car) (*operating* a drill press) . . . to manage and put or keep in operation whether with personal effort or not (*operated* a grocery store).' Unlike the words 'contrives,' 'prepares,' 'sets up' or 'proposes,' which envision preparatory activity, the word 'operates' denotes ongoing conduct which advances the progress of an existing entity. This term stands apart from the others, which describe various stages of formulation of the scheme; one who 'operates' a scheme may carry it along after its inception. We reject appellants' claim that 'operate' applies only to the creators and designers of the scheme." (*Id.* at p. 471, original italics.) Defendant's citation to *Wells Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 605 [61 Cal.Rptr.2d 826] is essentially in agreement, "The definitions of owner and operator [(Pub. Resources Code, § 3009, oil and gas wells)] . . . clearly envision someone who exercises some form of control over *or active involvement in* the drilling, maintaining or operation of the well." (Italics added.)

Defendant argues, "[T]here was no evidence presented that [he] played a supervisory role or had any control over the operation." Neither interpretation in the two cited decisions envision such a supervisory requirement. Rather, they provide for the alternative "active involvement" in the operation—be it an endless chain scheme, a oil or gas well enterprise, or, as in this instance, the operation of a chop shop. Defendant had more than a "mere participation" in the operation as he suggests: he and one other individual were found to be residing in the residence where the chop shop operation was conducted; he was personally in possession of several of the documents related to change of title on the various cars and trucks; he had applied for and possessed various drivers' licenses in different names; a set of keys found in the living room of the residence opened a shed at the rear of the house, which contained a bag of tools used for altering VIN tags; he was observed by officers to be involved in the auto theft and burglary during the days immediately preceding the search; and he had previously been found to be in possession of motor vehicle registration papers for numerous cars. We find there was sufficient evidence to demonstrate that defendant operated a chop shop within the common meaning of the term "operate."

C.-G.*

*See footnote, *ante*, page 408.

## IV. DISPOSITION

The judgment is modified to reverse the award of presentence credits. In all other respects the judgment is affirmed. Upon issuance of the remittitur, a hearing is to be held to determine if defendant is entitled to presentence credits. The clerk of the superior court is to prepare an amended abstract of judgment which correctly reflects defendant's presentence credits, if any, and forward it to the Department of Corrections.

Grignon, J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 12, 2000.